# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0072 (CRC)** |
| **v.** | : | |
| | : | |
| **GRACYN COURTRIGHT,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Gracyn Courtright to 6 months of incarceration; one year of supervised release; 60 hours of community service; $500 in restitution; and the mandatory $25 assessment.

### I.      Introduction

The defendant, Gracyn Courtright (hereinafter "Courtright" or "the defendant"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Courtright pleaded guilty to one count of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. While recognizing the defendant did not personally engage in violence or property destruction, a custodial sentence is appropriate in this case. In the course of committing her conduct, the defendant: (1) penetrated the Capitol building all the way to the

Senate floor—and even briefly stepped inside the door to look around[1]; (2) while inside the Capitol she picked up and carried around a "Members Only" sign which she only returned after being ordered to do so by law enforcement on her way out of the Capitol; (3) witnessed rioters damaging property and attempting to break into locked doors as soon as she entered the Capitol and continued to walk inside; (4) posted on her social media in posts that evidence a total lack of remorse and falsely downplayed the violence of January 6 (including a post to Instagram with the caption "Infamy is just as good as fame. Either way I end up more known. XOXO"); and (5) while inside she, along with a large mob, chanted at a line of law enforcement "whose house, our house" and "USA."

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—

---

[1] Footage of the defendant stepping onto the Senate floor was not discovered by law enforcement until after she pled guilty on August 30, 2021; during early stages of the investigation, a message on Ms. Courtright's social media indicated she may have been present on the floor, but law enforcement was unable to locate footage to confirm this. Had this video been discovered earlier, Courtright would likely have faced felony charges—specifically a charge for violating 18 U.S.C. § 1512(c)(2). Such a charge would have increased her guidelines range under the United States Sentencing Guidelines (U.S.S.G.) to approximately 15-21 months. *See United States v. Hodgkins*, 21-cr-188-RDM, ECF 32 (discussing the guidelines range for a single charge of 18 U.S.C. § 1512(c)(2)).

2

contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Gracyn Courtright's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Gracyn Courtright traveled to Washington, D.C., from her home in West Virginia to attend a rally on the Ellipse of the National Mall on January 6, 2021. After the rally, the defendant walked to the U.S. Capitol. She entered the Capitol building at approximately 2:42 p.m. via the Parliamentarian door near the West Senate Stairs. This door was breached approximately 20 seconds before Courtright entered and she entered shortly after the first few people who entered had engaged in a brief struggle with law enforcement. As she stood near the doorway, people around her were using signs to try and break into locked doors. (For clarity, the government has inserted red ovals to identify Courtright in the below still shots from the surveillance footage.)





Defendant Courtright was undeterred by the destruction of property occurring around her and proceeded further into the Capitol. While inside, she took a number of cell phone videos which she later posted to her Twitter account. Two videos showed her near the front of a group of a large group of people chanting at a line of law enforcement officers "whose house, our house" and "USA." She posted one video with a caption indicating that people were "PEACEFULLY CHANTING!!!!!!!!!! Nobody fighting or destroying anything some of my cnn & Fox News watchers need to think for themselves" and another video with the caption "the police officers walked around with us, nobody is being violent!!!! (From what I saw)."





After entering and taking videos in this hallway, Courtright proceeded to pick up a "Members Only" sign and walk upstairs near the Senate Chambers at approximately 3:01 p.m.



Courtright then briefly stepped inside the floor of the Senate Chamber at approximately 3:04 p.m., where she remained for approximately one minute.  The defendant's presence on the Senate floor was an intrusion into the very physical space where the certification should have been taking place, but for the breach of the Capitol by the defendant and the other rioters.



After leaving the Senate floor, Courtright started to walk back downstairs at 3:05 p.m. A law enforcement officer approached her and requested that she give him the sign. Courtright returned the sign at the officer's request and left the building through the North Door at approximatley 3:06 p.m. As she walked out, she gesticulated by "pumping" her arms in the air.



        In total, Courtright spent approximately 24 minutes inside the Capitol.  She admitted that

she knew at the time she entered the Capitol building that she did not have permission to enter the

building and that she entered into and remained in a restricted building.

        As a condition of her plea agreement, Defendant Courtright voluntarily interviewed with

law enforcement and stated the following. After the rally, she saw people carrying a large flag and

joined in to help carry the flag. She stopped carrying the flag when it arrived at the U.S. Capitol.

She heard people say they were going inside the Capitol and waited in a line to go inside. As she

went inside, she claimed that she was focused on turning her phone on and did not pay attention

to what was going on around her. She did remember seeing a circle of law enforcement officers,

people chanting, people trying to break things, and others telling them not to break things.

According to the defendant, after she entered she started looking for a place to charge her phone.

At some point she asked a law enforcement officer if she was allowed to be there and he said "I

don't even know."[2] According to the defendant, she saw a bunch of "Members Only" signs together and wanted to take a picture with one. She picked one of the signs up and walked around with it until a law enforcement officer took it back. Ms. Courtright admitted to walking out onto the Senate floor, but stated she did not realize she was on the Senate floor at first. She left the Capitol after hearing another law enforcement officer announce that anyone still inside would get trespassing tickets.

*Social Media Posts*

As noted above, after the attack on the Capitol, Courtright used Twitter to spread misleading information that the attack was "peaceful" and that nobody was violent, fighting, or destroying anything—even though she had just witnessed people trying to break into locked doors.

She also posted a photo to Instagram with the caption "Infamy is just as good as fame. Either way I end up more known. XOXO."

---

[2] Ms. Courtright was unable to provide any information as to when this statement was made to her, where it was made to her, or who may have made the statement.



In addition to her social media posts, she engaged in a direct message conversation after January 6 wherein she falsely claimed "it wasn't violent like the news said I took pictures all in the building, I never saw the violence I guess I was lucky...[t]he cops let's [sic] us walk in...I walked into the chamber like the senate where desk are [sic] it's history idc...I thought it was cool."  She also stated that she was "not embarrassed"—reflecting a lack of remorse for her involvement in the events of January 6, 2021.

11

*The Charges and Plea Agreement*

On January 16, 2021, Defendant Courtright was charged via complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2); 40 U.S.C. §§ 5104(e)(2)(D), (G); and 18 U.S.C. § 641. On January 19, 2021 she was arrested in West Virginia. On February 2, 2021, she was charged by a five-count Information with 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building); and 18 U.S.C. § 641 (Theft of Government Property). On August 30, 2021, she pleaded guilty to Count One of the Information, charging her with a violation of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds).[3] By plea agreement, she agreed to pay $500 in restitution and interview with law enforcement.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000, and a term of supervised release of not more than one year. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol and the defendant agreed to pay restitution in the amount of $500. That restitution should be paid to the Architect of the Capitol as indicated in the PSR. PSR ¶ 88.

---

[3] As noted in Footnote 1, *supra*, at the time the defendant entered the plea agreement, the government was not aware that Ms. Courtright had entered the floor of the Senate.

## IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR except as noted below. According to the PSR, the U.S. Probation Office calculated Courtright's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[4] | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 36-45.

The U.S. Probation Office calculated Courtright's criminal history as a Category I, which is not disputed. PSR at ¶ 48. Accordingly, the U.S. Probation Office calculated Courtright's total adjusted offense level, after acceptance, at 4, and her corresponding Guidelines imprisonment

---

[4] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a secure government facility" under U.S.S.G. §2B2.3(b)(1)(A)(i). PSR 38. As indicated in Courtright's plea agreement, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii).  *See* ECF 19, 20. The PSR correctly references this provision in ¶ 89.

range at 0-6 months. PSR at ¶¶ 4, 87-90. Courtright's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation, except as indicated in footnote 4.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id*. at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one."

*Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The purposes of sentencing, pursuant to § 3553(a)(2), are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id*.; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); the Guidelines and the Guideline

range, 18 U.S.C. § 3553(a)(4), and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials;

and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

The defendant's entry into the Capitol and behavior after leaving raise significant concerns. As soon as she stepped over broken glass and entered the Capitol building, she saw people attempting to break into locked doors and engaging in the destruction of property. She clearly knew she did not have permission to enter the Capitol and did so anyway—remaining inside for approximately 24 minutes.

The government currently has no evidence that Courtright engaged in any violence or destruction of property at the Capitol.  However, Courtright was also one of a relatively small number of rioters who stepped onto the Senate floor—the very location where the certification should have been taking place, but for the actions of the defendant and her fellow rioters. Additionally, as shown above in the snapshots from her Twitter posts, at one point she was near the front of a large crowd screaming and chanting at a line of officers. Additionally, the defendant picked up and carried a "Member's Only" sign through the Capitol, only returning it after being instructed to do so by law enforcement on her way out of the Capitol.  This act itself embodies a complete disregard for the importance of what was scheduled to occur at the Capitol that day and the elected lawmakers who were supposed to participate in the certification.

Just as troubling as her entry into the Capitol, her posts and statements after she left the Capitol appear to show a near total lack of remorse. As noted above, she falsely portrayed the level of violence and destruction inside the Capitol; posted that "infamy is just as good as fame"; and "thought it was cool."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

The defendant is a single, 24-year-old who on January 6, 2021 was a student at the University of Kentucky. She was born in West Virginia and described growing up in a stable household. She indicated she remains close with her family and currently lives with her parents. She appears to have no criminal history. The defendant has been largely compliant with conditions of pre-trial release.[5]

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

---

[5] According to the PSR, ¶ 10, the defendant has been granted permission to visit family and friends who reside in Mason, Ohio; Cleveland, Ohio; Cincinnati, Ohio Florence, Kentucky; Lexington, Kentucky; Palm Beach, Florida; Savannah, Georgia; Emerald Island, North Carolina and Charlotte, North Carolina.

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). As this Court knows, it is important to convey to future rioters—particularly those rioters who intend to disrupt the democratic process—that their actions will have consequences. Unlawfully interfering with government—whether a riot at a courthouse or a riot during an election – is categorically wrong. But participating in a riot that encompassed such widespread violence and destruction, on a day that is intended to be a solemn prelude to the transition of power, merits special consideration.

*Specific Deterrence*

The defendant's brazenness in publicizing her crimes shows the need for specific deterrence in this case. It is concerning enough that she added herself to the mob overwhelming law enforcement. But, following her entry into the Capitol, she displayed pride for doing so and sought to publicize the events of January 6, 2021, on her social media. Furthermore, she downplayed and mischaracterized the destruction and violence rather than showing remorse. Her words spread harm further than her actions that day and warrant specific deterrence in and of themselves.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[8] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[9] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that

---

[8] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count One of the Information, charging her with 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds). At this time only one defendant has been  sentenced for pleading guilty to 18 U.S.C. § 1752(a)(1).[10] However, as the attached Table shows, the government has requested incarceration in at least twenty-two (22) misdemeanor cases. While it is impossible to sentence defendants mathematically or formulaically, particularly in light of the § 3553(a) factors, the government submits that its request is in line with its recommendation for other similarly situated defendants.

Although, many other defendants participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other

---

[10] *US v. Kevin Cordon*, 21-cr-277, was sentenced on November 12, 2021 before Judge McFadden.. *See* ECF 34, 21-cr-277-TNM.

relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

In Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed in the following cases. Regarding Defendant Courtright's entry onto the Senate floor, *United States v. Paul Hodgkins*, 21-cr-188-RDM, and *United States v. Jacob Chansley*, 21-cr-003-RCL, are instructive. Hodgkins and Chansley both entered the Capitol building and saw broken windows and people who were injured inside. Like Defendant Courtright, they continued into the Capitol all the way to the Senate floor. They remained on the Senate floor, including walking up to the dais. Hodgkins was sentenced to 8 months of incarceration and Chansley was sentenced to 41 months of incarceration.

Other cases involving entry into sensitive spaces include *United States v. Matthew Mazzocco*, 21-cr-54-TSC, where the defendant entered into the Spouse's Lounge and downplayed the significance of January 6 to family and friends; *United States v. Derek Jancart*, 21-cr-184-JEB where the defendant went into the Speaker's conference room; and *United States v. Erik Rau*, 21-cr-467-JEB where the defendant entered into the Speaker's Conference room. In *Jancart*, the defendant, like Defendant Courtright, demonstrated a lack of remorse on social media, and spread propaganda by falsely downplaying the violence. The government requested three months of home detention in *Mazzocco* and four months of incarceration in both *Jancart* and *Rau*. All three were

sentenced to 45 days of incarceration. Additionally, other cases, including *United States v. Jennifer Ryan*, 21-cr-050-CRC, present aggravating factors involving social media like the instant case. In *Ryan*, the defendant, like Defendant Courtright, made a number of comments on various social media platforms minimizing and denying the violence that occurred and her actions. In addition to displaying a lack of remorse, these types of social media posts spread misinformation and propaganda which continues to spread harm.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Conclusion

For the reasons set forth above, the government recommends that this Court sentence Gracyn Courtright to 6 months of incarceration, one year of supervised release; 60 hours of community service; $500 in restitution; and the mandatory $25 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early

acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

Rachel A. Fletcher
TX Bar 24078505
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W., Room 4840
Washington, D.C.  20530
Office: 202-252-7093
Rachel.Fletcher@usdoj.gov